**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

LILY ENGLEMAN,

Plaintiff,

v.

WILLIAM CLAYTON NIX, JOHN
RICHEY, TOMEKIA JORDAN,
MIKE RILEY, and JONATHAN
ADAMS,

Defendants.

Civil Action
File No. _____

## <u>**COMPLAINT**</u>

In November of 2019, Plaintiff Lily Engleman was wrongfully arrested after visiting her client Ricky Dubose at a Georgia prison facility.  Lily is a social worker who was employed as a mitigation investigator with the Georgia Capital Defender Office where she was on the defense team for Dubose, a capital defendant being prosecuted for the alleged murder of two Georgia Department of Corrections ("GDC") officers.  Unbeknownst to Lily, several GDC agents had been surreptitiously recording meetings between Dubose and the members of his defense team, including Lily.  After a September meeting between Lily and Dubose, GDC agents fraudulently secured an arrest warrant by misrepresenting to

1

a magistrate judge that the video recording of the visit showed Lily passing Dubose contraband.  The video showed no such thing.

Lily filed suit against three GDC agents in a separate action: Engleman v. Adkerson et al., NDGA Case no. 1-21-cv-1992-MLB.  In that action, Lily sued (1) Nathan Adkerson, the agent who swore out the false arrest warrant, (2) Maryjane Moss, the agent who helped Adkerson arrest Lily and was aware that Adkerson was securing a false arrest warrant, and (3) Jose Morales, the warden of the GDC Special Management Unit, the area where Dubose was housed and where the surreptitious recording occurred.  Discovery in that case revealed that the Defendants here were also involved in Lily's investigation and wrongful arrest.

Specifically, discovery revealed that the following Defendants played the following roles: Tomekia Jordan was the Special Agent in Charge ("SPC"), Mike Riley was the Assistant SPC, William Clayton ("Clay") Nix was the Director of the Office of Professional Standards ("OPS"), John Richey was the Assistant Director of OPS, and Jonathan Adams was the District Attorney for the Towaliga Judicial Circuit, which includes Butts County.  The GDC Defendants reviewed the video recording which does not show Lily passing contraband to Dubose, they were aware that these meetings were being surreptitiously recorded, they discussed the plan to secure an arrest warrant for Lily, and they did not try to stop Adkerson

from securing the arrest warrant.  Defendant Adams, the District Attorney,

reviewed the video with Adkerson and advised Adkerson to secure the false

warrant – knowing that the video did not show Lily passing contraband to Dubose.

### Parties, Jurisdiction, and Venue

1.  Plaintiff Lily Engleman is a natural person and citizen of the United States
    of America, residing in Georgia, and is of full age.

2.  Defendant Tomekia Jordan is an individual who was, at all times relevant to
    the allegations in this complaint, an employee of the Georgia Department of
    Corrections, acting under color of law.

3.  Defendant Mike Riley is an individual who was, at all times relevant to the
    allegations in this complaint, an employee of the Georgia Department of
    Corrections, acting under color of law.

4.  Defendant William Clayton Nix ("Clay") is an individual who was, at all
    times relevant to the allegations in this complaint, an employee of the
    Georgia Department of Corrections, acting under color of law.  On
    information and belief, Defendant Nix resides in Henry County, Georgia.

5.  Defendant John Richey is an individual who was, at all times relevant to the
    allegations in this complaint, an employee of the Georgia Department of
    Corrections, acting under color of law.

6.  Defendant Jonathan Adams is an individual who was, at all times relevant to the allegations in this complaint, the District Attorney for the Towaliga Judicial Circuit, which includes Butts County, acting under color of law.

7.  This action is brought pursuant to 42 U.S.C. §§1983 and 1988 and the First, Fourth, and Fourteenth Amendments to the United States Constitution.

8.  All the parties herein are subject to the personal jurisdiction of this Court.

9.  Venue is proper in this Court pursuant to 28 U.S.C. §1391(b) and L.R. 3.1(B)(1)(b), NDGa because a Defendant resides within the district and divisional boundaries of the Atlanta Division of the Northern District of Georgia.

## Facts

***Lily Engleman – Licensed Social Worker and Capital Mitigation Specialist***

10. Lily Engleman is a professional social worker.  Lily earned her master's degree in social work at Georgia State University in 2017 and she was licensed as a Licensed Master Social Worker.

11. After Lily earned her master's degree, she was hired in 2017 by the Georgia Capital Defender Office as a mitigation specialist in capital cases.

12. Mitigation is a sacrosanct and constitutionally required role in death penalty defense.  Mitigation specialists are counselors who speak for the dignity and value of those who are accused of capital offenses.

13. Mitigation specialists have the clinical skills to elicit sensitive, embarrassing, and often humiliating evidence that the defendant may never have disclosed to understand how these conditions may have affected the defendant's development and behavior.

14. Mitigation specialists do years of investigation into a capital defendant's background so that they can help juries understand the life of a capital defendant when the jury must decide whether the defendant will live or die.

15. The U.S. Supreme Court has time and again stressed the crucial role played by mitigation investigation in capital cases – competent, professional mitigation investigation is constitutionally required so that death sentences are not handed out arbitrarily:

   a. "Because of th[e] basic difference between the death penalty and all other punishments, this Court has consistently recognized that there is a corresponding difference in the need for reliability in the determination that death is the appropriate punishment in a specific

case." <u>Barefoot v. Estelle</u>, 463 U.S. 880, 913–914, 103 S.Ct. 3383 (1983) (dissenting opinion).

b. In the sentencing phase of a capital case, "[w]hat is essential is that the jury have before it all possible relevant information about the individual defendant whose fate it must determine." <u>Jurek v. Texas</u>, 428 U.S. 262, 276, 96 S.Ct. 2950 (1976) (opinion of Stewart, POWELL, and STEVENS, JJ.).

c. For that reason, the Supreme Court has repeatedly insisted that "the sentencer in capital cases must be permitted to consider any relevant mitigating factor" and that "a sentencing judge's failure to consider relevant aspects of a defendant's character and background creates []an unacceptable risk that the death penalty was unconstitutionally imposed…" <u>Eddings v. Oklahoma</u>, 455 U.S. 104, 112, 117, 102 S.Ct. 869 (1982) (O'CONNOR, J., concurring).

16. As a mitigation investigator with the Georgia Capital Defender Office, Lily was assigned, among other cases, to the defense of Ricky Dubose.

17. Mr. Dubose is accused in a high-profile criminal case. Mr. Dubose and a codefendant are accused of killing two Department of Corrections officers while escaping from custody in 2017, a case that garnered national attention.

### The Illegal Targeting of the Dubose Defense Team

18. In September of 2019, agents with the Georgia Department of Corrections' Office of Professional Standards ("OPS") began targeting Mr. Dubose's defense team.

19. The OPS agents who targeted Dubose's defense team included four of the Defendants in this action - Tomekia Jordan, Mike Riley, Clay Nix, and John Richey. (These four Defendants are hereinafter the "GDC Defendants").

20. The OPS agents who targeted Dubose's defense team also included two defendants in the previous action, Nathan Adkerson and Maryjane Moss. (The six OPS agents being sued in both actions – Jordan, Riley, Nix, Richey, Adkerson, and Moss – are hereinafter the "OPS Agents.")

21. The OPS Agents began surreptitiously recording privileged meetings between Mr. Dubose and his lawyers and/or the investigators on Mr. Dubose's defense team.

22. The OPS Agents surreptitiously recorded privileged meetings between Mr. Dubose and his lawyer.

23. The OPS Agents surreptitiously recorded privileged meetings between Mr. Dubose and his mitigation specialist, Lily Engleman.

24. The OPS Agents did not inform the lawyers and investigators on Mr. Dubose's legal defense team that they were surreptitiously recording them.

25. The OPS Agents did not seek or obtain a warrant in order to surreptitiously record privileged meetings between Mr. Dubose and his defense team.

26. GDC officials had previously prevented Mr. Dubose's legal defense team from having meaningful contact with Mr. Dubose when an attorney was not present (e.g. an investigator trying to meet with Mr. Dubose without the attorney joining), so Dubose's defense team sought and were granted an Order from the judge overseeing Mr. Dubose's criminal case. That Order required that GDC officials allow any member of Mr. Dubose's legal defense team to have confidential contact with Mr. Dubose.

27. The Court's Order allowing contact visits between Mr. Dubose and non-attorney members of Mr. Dubose's legal defense team was entered on June 21, 2018 and states in relevant part (emphasis supplied):

> It is hereby ordered that Mr. Ricky Allen Dubose, GDC No. 1000492869, shall be permitted contact visits with all members of the defense team regardless of whether an attorney is present. **Said visits shall be conducted in a confidential setting**.

28. The OPS Agents had a copy of this order.

29. The OPS Agents did not inform the lawyers and investigators on Mr. Dubose's legal defense team, nor did they inform the judge who had issued

the Order, that they were planning to violate this Order by surreptitiously recording Mr. Dubose's meetings with his legal defense team – despite the clear language in the order that **"Said visits shall be conducted in a confidential setting."**

30. The OPS Agents did not notify Lily Engleman or the other members of the Dubose defense team that they were being surreptitiously recorded when they met with Mr. Dubose.

31. There were no signs or other indications in the meeting rooms where Mr. Dubose met with his legal defense team that their meetings were being recorded.

32. Lily and the other members of the Dubose defense team had a reasonable expectation of privacy when they were meeting with Mr. Dubose.

33. Lily and the other members of the Dubose defense team reasonably relied on the court order that their meetings with Mr. Dubose would be confidential, and trusted that GDC officials would not be recording their meetings with Mr. Dubose.

34. It is clearly established by binding 11th Circuit precedent[1] as well as Georgia statute[2] that it is illegal to record a criminal defendant's meeting with his lawyer (or defense team[3]), even when done in an interrogation room.

35. It is also clear under Georgia law that communications between a licensed social worker like Lily Engleman and her patient are privileged and confidential.[4]

36. In short, the surreptitious recording of Mr. Dubose's privileged meetings with his legal defense team violated the U.S. Constitution, several Georgia laws, and an unambiguous court order.

---

[1] See, e.g., Gennusa v. Canova, 748 F.3d 1103 (11th Cir. 2014) (holding that various members of county sheriff's office violated a detainee's Fourth Amendment rights by intercepting his privileged conversations with his attorney in an interview room).

[2] See O.C.G.A. § 16-11-62(2)(A)("it it shall not be unlawful [] To use any device to observe, photograph, or record the activities of persons incarcerated in any jail, correctional institution, or other facility in which persons who are charged with or who have been convicted of the commission of a crime are incarcerated, **provided that such equipment shall not be used while the prisoner is discussing his or her case with his or her attorney**.")(emphasis supplied).

[3] See, e.g., Spence v. Hamm, 226 Ga.App. 357, 487 S.E.2d 9 (1997) (holding that attorney-client privilege applies equally to member of attorney's office).

[4] See O.C.G.A. § 24-5-501(a)(7)

### *The Failed Investigation and False Claims Against Lily*

37. The investigation into Mr. Dubose's defense team was fruitless – Mr.

    Dubose's defense team was not doing anything illegal.  Instead of closing

    the investigation, however, Nathan Adkerson drew up false charges against

    Lily with the knowledge, acquiescence, and help of the GDC Defendants.

38. On November 4, 2019, Adkerson swore out an affidavit claiming that the

    video recording from a September 6, 2019 visit between Lily and Mr.

    Dubose showed Lily passing Mr. Dubose two items of contraband.

39. This affidavit supplied the only grounds for Lily's arrest and public

    shaming.

40. Adkerson's false affidavit reads as follows:

---

**AFFIDAVIT**

Personally came Nathan Adkerson, who on oath says that, to the best of his/her knowledge and belief Lily    Eugenia Engleman did, commit the offense of, 42-5-18(a) Felony, Giving weapons, intoxicants, drugs, or other items to inmates without consent of warden on September 06, 2019 at 03:42 PM to September 06, 2019 at 03:49 PM, in Butts County. The place of occurrence of said offense being 2978 Hwy 36 W Jackson GA 30233; and against State of Georgia.

Said offense being described as:  42-5-18(a)  Felony, Giving weapons, intoxicants, drugs, or other items to inmates without consent of warden
For the said Lily    Eugenia Engleman did violate O.C.G.A. 42-5-18(a) when he/she unlawfully to wit said accused did on the date of September 06, 2019 at between 3:42 PM and 3:39 PM hours   she was observed passing Georgia Department of Corrections Inmate Ricky Dubose two small unknown items that Inmate Ricky Dubose was observed picking the items up from the floor and then hiding said items in his socks as to avoid detection by staff. Said accused did pass these items to inmate Ricky DuBose with out the permission or consent of the Warden at the Georgia Diagnostic & Classification Prison Special Management Unit, A Correctional facility located in Butts County Georgia

---

41. This sworn affidavit is false.

42. The video recording of Lily's September 6, 2019 meeting with Mr. Dubose is well-lit and clear as day.

43. The video recording of Lily's September 6, 2019 meeting with Mr. Dubose does not show Lily "passing Georgia Department of Corrections Inmate Ricky Dubose two small unknown items."

44. The video recording of Lily's September 6, 2019 meeting with Mr. Dubose does not show Mr. Dubose "picking the items up off the floor and hiding them in his socks."

45. In the affidavit, Adkerson did not identify the two items of contraband.  At no time in Lily's arrest or criminal prosecution did Adkerson identify the two items of contraband.  To date, Adkerson has not identified the two items of contraband.

46. The OPS Agents have not identified the two items of contraband because Lily did not pass Mr. Dubose contraband.

47. The video recording of Lily's September 6, 2019 meeting with Mr. Dubose shows a typical interview between a mitigation investigator and her client.

48. Because the purpose of mitigation investigation is to gain as much information as possible about a client's history, mitigation investigators seek detailed personal histories from clients.  Mitigation investigators ask about

the client's personal and psychological history – relationships, major life events, past emotional trauma – as well as the client's physical and medical history – scars, medical diagnoses, tattoos, past physical trauma – to get a complete history.

49. For this reason, a mitigation investigator is not always sitting quietly taking notes; a mitigation investigator needs to have contact visits with a client so that the client can roll up his sleeves, lift up his pant leg, or roll down his socks to show a scar or a tattoo, as part of the complete history.

50. The portion of the video recording referenced in the affidavit, 3:42 to 3:49, shows a typical interview between a mitigation investigator and client; it does not show Lily passing contraband to Mr. Dubose.

51. The video recording of Lily's September 6, 2019 meeting with Mr. Dubose has been filed under seal in the previous action and is incorporated here by reference, maintaining any and all of the protections created by the Order in that case sealing the filing.

52. In addition, it is policy at the Special Management Unit (the unit where Dubose was housed) that an inmate undergoes a full strip search <u>before and after</u> a contact visit with the inmate's attorney or an investigator with the attorney's office.

53. In fact, Special Management Unit Warden Jose Morales testified at an *ex parte* hearing[5] on December 2, 2019, that when he took over as warden in July of 2019, he "made it a practice to make sure we were enforcing the [strip search] policy."

54. When Mr. Dubose was strip searched <u>before and after</u> the September 6, 2019, visit with Lily, he did not have contraband on his person.

55. Defendant Tomekia Jordan, Special Agent in Charge ("SPC"), was involved in Lily's investigation.

56. Defendant Jordan watched the video of Lily's September 6, 2019 meeting with Mr. Dubose.

57. Defendant Jordan was aware that the video of Lily's September 6, 2019 meeting with Mr. Dubose did not show Lily passing contraband to Mr. Dubose.

58. Defendant Jordan was aware that Adkerson intended to secure a warrant for Lily's arrest.

59. Defendant Jordan agreed with the decision to secure a warrant for Lily's arrest.

---

[5] Adkerson's illegal recording of attorney-client meetings has been the subject of extensive sealed litigation in Mr. Dubose's criminal matter; a portion of the December 2 hearing has been unsealed.

60. Defendant Jordan advised Adkerson to secure a warrant for Lily's arrest.

61. Defendant Mike Riley, Assistant SPC, was involved in Lily's investigation.

62. Defendant Riley watched the video of Lily's September 6, 2019 meeting with Mr. Dubose.

63. Defendant Riley was aware that the video of Lily's September 6, 2019 meeting with Mr. Dubose did not show Lily passing contraband to Mr. Dubose.

64. Defendant Riley was aware that Adkerson intended to secure a warrant for Lily's arrest.

65. Defendant Riley agreed with the decision to secure a warrant for Lily's arrest.

66. Defendant Riley advised Adkerson to secure a warrant for Lily's arrest.

67. Defendant Clay Nix, OPS Director, was involved in Lily's investigation.

68. Defendant Nix watched the video of Lily's September 6, 2019 meeting with Mr. Dubose.

69. Defendant Nix was aware that the video of Lily's September 6, 2019 meeting with Mr. Dubose did not show Lily passing contraband to Mr. Dubose.

70. Defendant Nix was aware that Adkerson intended to secure a warrant for Lily's arrest.

71. Defendant Nix agreed with the decision to secure a warrant for Lily's arrest.

72. Defendant Nix advised Adkerson to secure a warrant for Lily's arrest.

73. Defendant John Richey, OPS Assistant Director, was involved in Lily's investigation.

74. Defendant Richey watched the video of Lily's September 6, 2019 meeting with Mr. Dubose.

75. Defendant Richey was aware that the video of Lily's September 6, 2019 meeting with Mr. Dubose did not show Lily passing contraband to Mr. Dubose.

76. Defendant Richey was aware that Adkerson intended to secure a warrant for Lily's arrest.

77. Defendant Richey agreed with the decision to secure a warrant for Lily's arrest.

78. Defendant Richey advised Adkerson to secure a warrant for Lily's arrest.

79. Defendant Jonathan Adams, the Towaliga Judicial Circuit District Attorney, reviewed the video with Adkerson and other OPS officials and advised

Adkerson and those officials to secure the false warrant, knowing that the video did not show Lily passing contraband to Dubose.

80. Defendant Adams later admitted to Lily's defense attorney, Don Samuel, that the video does not show Lily passing contraband to Dubose.

81. Defendant Adams also later made the following statement to a reporter with WMAZ: "You could not see actually contraband in the video, and based off of the fact that she was terminated with no prior record and no prior criminal record, we felt at that time was to nolle prosequi the case."

82. Based only on Adkerson's false affidavit, a warrant was issued for Lily's arrest.

### *Lily is Arrested, Publicly Shamed, and Loses her Job*

83. On November 6, 2019, the OPS Agents surreptitiously recorded another meeting between Lily and Mr. Dubose.

84. Again on November 6, Lily did not pass anything to Mr. Dubose.

85. After the meeting, Nathan Adkerson and Maryjane Moss arrested Lily for the felony offense of "Giving weapons, intoxicants, drugs, or other items to inmates without consent of warden."

86. Lily was arrested and transported to the Butts County Jail.

87. Before Lily arrived at the Butts County Jail, Defendant Clay Nix, the Director of OPS, tipped a reporter that Lily was being arrested and that she would be booked into the Butts County Jail.

88. Defendant Nix's intent in calling the reporter was to publicly shame and humiliate Lily.  Defendant Nix acted out of unconscionable malice and cruelty, to publicly humiliate Lily and ruin her life, knowing that the charges against her were false.

89. When Lily arrived at the sally port at the Butts County Sheriff's Office she was met by a reporter.

90. The Butts County Sheriff's Office does not allow the general public into the sally port, of course, and the Sheriff's Office certainly does not allow the general public into the sally port when transporting a person in custody.

91. Regardless, Butts County Sheriff's Office officials allowed the reporter into the sally port.  The officials did this to publicly shame Lily.

92. The Butts County Sheriff's Office gave the reporter unprecedented access to Lily's booking; the reporter recorded Lily's intake questions, her fingerprinting, and her first appearance.

93. The reporter even recorded Lily for hours as she sat in a holding cell.

94. Again, the Butts County Sheriff's Office does not allow the general public into the booking area while people in custody are being booked, and it does not allow the general public to sit and stare at detainees in the holding cells – that is not an area which is open to the public.

95. But Butts County Sheriff's Office officials allowed the reporter unprecedented access because Lily had been targeted for public ridicule.

96. The reporter ran the story with footage of Lily getting out of the patrol car, being booked, being fingerprinted, and going to a first appearance hearing.

97. Lily's arrest was covered by several other media outlets.

98. Even today, the first result in a Google image search brings up Lily's mugshot.

99. Lily's social work license was not renewed because of the felony charges.

100.     Lily's employer terminated her employment because of the felony charges.

101.     Lily was unable to find comparable employment because of the felony charges.  Lily applied with several other entities that employ mitigation investigators, but she was repeatedly turned down because she was facing felony charges and because her bond conditions prevented her from visiting state inmates.

102.     Lily eventually returned to the restaurant where she had worked
before graduate school.

### The OPS Agents' Deceit Finally Comes to Light

103.     Lily waited for over a year as these false charges haunted her,
wondering how she could have been charged with a crime she did not
commit.

104.     Finally, in November of 2020, more than a year after her arrest, the
state turned its case file over to Lily's attorney.

105.     Lily was finally able to view the video which Adkerson claimed
would show her committing a felony.  Of course, it showed no such thing.

106.     Lily's attorney took the video to Defendant Adams, who
acknowledged to Lily's attorney that the video did not show Lily passing
contraband to Mr. Dubose.

107.     Finally, after this nightmarish sixteen-month ordeal – after Lily
suffered a year and a half of living under the shadow of fabricated felony
charges, after being shamed on major news outlets, after her social work
license was not renewed, and after losing her job – Defendant Adams
dismissed Lily's criminal case.

108.     Lily's life has been forever damaged by this series of patently amoral, unconstitutional acts of the OPS Agents and Defendant Adams.  She is entitled to compensation for these grave offenses.

**COUNT I**
**Against GDC Defendants and Defendant Adams Under 42 U.S.C. § 1983**
**False Statements in Affidavit, Arrest without Arguable Probable Cause,**
**Malicious Prosecution, and Failure to Intervene**

109.     Nathan Adkerson obtained an arrest warrant for Lily Engleman using a falsified and misleading affidavit.

110.     Before an arrest warrant may be issued consistent with the provisions of the Fourth Amendment to the U.S. Constitution, a truthful factual showing used to support probable cause must be proved to the issuing court.

111.     The U.S. Constitution prohibits a law enforcement officer from knowingly, intentionally, or with reckless disregard for the truth making materially false statements in support of an application for a warrant.

112.     When applying for the arrest warrant, Adkerson knowingly and with reckless disregard for the truth made materially false and misleading statements and omissions to the issuing judicial authority.

113.     The false statements contained within the affidavit were material and necessary to the finding of probable cause by the issuing Court.

114.     Specifically, Adkerson's representation in the affidavit that Lily was seen "passing … Ricky Dubose two small unknown items" was material and necessary to the finding of probable cause by the issuing Court.

115.     The video recording of the September 6, 2019, visit between Lily and Mr. Dubose does not show Lily "passing … Ricky Dubose two small unknown items."

116.     Adkerson's representation in the affidavit that Lily was seen "passing … Ricky Dubose two small unknown items" was false information stated with a reckless disregard for the truth.

117.     Had false and misleading information in Adkerson's affidavit not been used, there would have been no probable cause, or even arguable probable cause, sufficient to procure an arrest warrant for Lily.

118.     The Defendants in this suit – the GDC Defendants and Defendant Adams – all watched the video of Lily's September 6, 2019 meeting with Mr. Dubose.

119.     The Defendants in this suit – the GDC Defendants and Defendant Adams – were aware that the video of Lily's September 6, 2019 meeting with Mr. Dubose did not show Lily passing contraband to Mr. Dubose.

120.     The Defendants in this suit – the GDC Defendants and Defendant Adams – were aware that Adkerson intended to secure a warrant for Lily's arrest.

121.     The Defendants in this suit – the GDC Defendants and Defendant Adams – agreed with the decision to secure a warrant for Lily's arrest.

122.     The Defendants in this suit – the GDC Defendants and Defendant Adams – advised Adkerson to secure a warrant for Lily's arrest.

123.     The Defendants in this suit – the GDC Defendants and Defendant Adams – were all in a position to stop Adkerson from obtaining the warrant to arrest Lily.

124.      Rather than stopping Adkerson, the GDC Defendants and Defendant Adams failed to intervene to stop the constitutional violations (the fraudulent, improper, and illegal obtaining of the warrant, the illegal arrest, and the subsequent illegal prosecution) and/or aided and abetted Adkerson in committing the constitutional violations alleged in this Complaint.

125.      Nathan Adkerson and Maryjane Moss arrested Lily under the arrest warrant which was obtained under false pretenses.

126.     The Defendants in this suit – the GDC Defendants and Defendant Adams – participated in violating Lily's constitutional rights because an

objectively reasonable law enforcement officer would have known that no

arguable probable cause existed to arrest Lily for the felony offense of

"Giving weapons, intoxicants, drugs, or other items to inmates without

consent of warden."

127.     The Defendants in this suit – the GDC Defendants and Defendant

Adams – were involved in the decision to prosecute Lily for this offense

with the intention to harm Plaintiff and out of malice.

128.     Accordingly, the GDC Defendants and Defendant Adams are each

individually liable for the damages sustained by Lily for her arrest and

prosecution, including, without limitation, her public humiliation and the

loss of her job and the non-renewal of her professional license.

**COUNT II**
**Against the GDC Defendants Under 42 U.S.C. § 1983**
**Illegal Search**

129.     The GDC Defendants were directly involved in recording privileged

and confidential meetings between Ricky Dubose and his defense team in

2019.

130.     The GDC Defendants were directly or indirectly involved in recording

the September 6, 2019 privileged and confidential meeting between Ricky

Dubose and Plaintiff Lily Engleman.

24

131.    The recording of Lily's confidential and privileged meetings with Mr. Dubose was a violation of Lily's Fourth Amendment right to be free from unreasonable searches and seizures, as well as her First Amendment right to free speech and her Fourteenth Amendment right to due process.

132.    Accordingly, the GDC Defendants are each individually liable for the damages sustained by Lily for the illegal surveillance of her confidential and privileged meetings with Mr. Dubose and all the damages that flowed therefrom – her subsequent illegal arrest and prosecution, her public humiliation, the loss of her job, and the non-renewal of her professional license.

## **Prayer for Relief**

WHEREFORE, Plaintiff prays that this Court issue the following relief:

1) That process issue in accordance with the law;

2) That the Court award Plaintiff compensatory and general damages in an amount to be determined by the jury against Defendants;

3) That the Court award Plaintiff punitive damages in an amount to be determined by the enlightened conscience of the jury against Defendants;

4) That the Court award costs of this action, including attorneys' fees, to Plaintiff, pursuant to U.S.C. § 1988 and other applicable laws regarding such awards;

5) That the Court award Plaintiff such other and further relief as it deems just and necessary; and

6) That Plaintiff be granted a trial by jury.

This 3rd Day of March, 2022

**ESHMAN BEGNAUD, LLC**

/s/ Mark Begnaud
Mark Begnaud
Georgia Bar No. 217641
mbegnaud@eshmanbegnaud.com
Michael J. Eshman
Georgia Bar No. 365497
meshman@eshmanbegnaud.com

315 W. Ponce De Leon Ave
Suite 775
Decatur, GA 30030
404-491-0170